IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| LORRAINE PAMELA PETERSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 15-CV-184-PJC |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of the | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Claimant, Regina Lynn Peterson ("Peterson"), pursuant to 42 U.S.C. § 405(g), requests

judicial review of the decision of the Commissioner of the Social Security Administration

("Commissioner") denying Peterson's application for disability insurance benefits under Title II

and for supplemental security income benefits under Title XVI  of the Social Security Act, 42

U.S.C. §§ 401 *et seq*.  In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have

consented to proceed before a United States Magistrate Judge. [Dkt. 10].  Any appeal of this

order will be directly to the Tenth Circuit Court of Appeals.  Peterson appeals the decision of the

Administrative Law Judge ("ALJ") and asserts that the Commissioner erred in determining that

Peterson was not disabled.  For the reasons discussed below, the Court **REVERSES** the

Commissioner's decision for reconsideration.

### Procedural History

On July 11, 2011, Peterson protectively filed her applications for disability insurance and

supplemental security income benefits alleging an onset date of December 30, 2008.  (R. 199-

206).  The applications were denied initially and on reconsideration.  (R. 95-98,115-120).  An

administrative hearing was held before ALJ Lantz McClain on March 18, 2013. (R. 54-73).  A

supplemental hearing was held by the ALJ on September 9, 2013. (R. 34-52).  The ALJ entered a

decision on October 23, 2013, finding Peterson was not disabled within the meaning of the

Social Security Act, and therefore not entitled to benefits. (R. 12-27). The Appeals Council

denied Peterson's request for review on February 11, 2015.  (R. 1-3).  Thus, the decision of the

ALJ represents the Commissioner's final decision for purposes of this appeal.  20 C.F.R. §

404.981, *Doyal v. Barnhart*, 331 F.3d 758, 759 (10th Cir. 2003).

### Claimant's Background

Peterson was 48 years old on her alleged disability onset date, December 30, 2008, and

she was 53 years old when the ALJ entered his decision on October 23, 2013.  (R. 26).  At the

administrative hearing on March 18, 2013, Peterson testified that she completed the twelfth

grade. (R. 58).  Peterson claimed she was unable to work due to: pain in her lower back,

shoulders and arms; dizziness and headaches due to microadenoma; and asthma.(R. 60-64).  She

testified that she can stand forty-five minutes comfortably. (R. 64).  She said she has no difficulty

sitting in a straight back chair for any length of time. *Id.*  She can walk for about forty-five

minutes but then has to stop and rest because her knees start hurting. *Id.*  She gets dizzy walking

and standing. *Id.*  If she tries to lift and carry more than five pounds, her arms, shoulders and

lower back start hurting.  She has trouble sleeping because of her back and wakes up after three

hours. (R. 65-66).  She sleeps two hours during the day. (R. 66).  She drives only when needed

because the majority of time, her son takes her where she needs to go. *Id.*  Chores around the

house consist of sweeping the kitchen and sometimes the living room. *Id.*  She spends her days

reading and meditating. *Id.* She goes to church every Sunday via the church van. (R. 68).  She

likes to draw and paint. *Id.*

At the supplemental hearing on September 9, 2013, Peterson testified that the medication she takes for the pituitary problem causes her "to be dizzy and unbalanced" twice a day and she has to lay down and rest for fifteen to twenty minutes before she is back to normal. (R. 42). She sometimes can feel the dizziness coming on and sits down or grabs something. (R. 43).  She has fallen down; the last time was a month before the hearing. *Id.*  She has had neck and back pain since 2000 but is not receiving medical treatment for that. (R. 44).  She saw a doctor about her back in 2006 or 2007 but his practice closed and she cannot locate those records. (R. 45).  She has not seen anyone else because she has no money. (R. 45).  Plaintiff testified at the supplemental hearing that she could stand for an hour at a time before her knees and back starting hurting. (R. 46).  She has to rest an hour and forty-five minutes. (R. 46).  This happens throughout the day. *Id.* She can sit for a few hours without a problem. (R. 47).  She cannot lift a gallon of milk because of pain in her shoulders and arms but she can lift a half gallon. *Id.*  She carries groceries in "a bag at a time." *Id.*  She also has pain in the knee and leg since 2000 and has had no treatment for it. (R. 48).

### Social Security Law and Standard Of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment."  42 U.S.C. § 423(d)(1)(A).  A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy."  42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability

claim.  20 C.F.R. § 404.1520.[1]  *See also Wall v. Astrue*, 561 F.3d 1048, 1052-53 (10th Cir. 2009)

(detailing steps).  "If a determination can be made at any of the steps that a claimant is or is not

disabled, evaluation under a subsequent step is not necessary."  *Lax v. Astrue*, 489 F.3d at 1084

(citation and quotation omitted).

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. §

405(g).  This Court's review is limited to two inquiries: first, whether the decision is supported

by substantial evidence; and, second, whether the correct legal standards were applied.  *Hamlin v.*

*Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).  Substantial evidence is

such evidence as a reasonable mind might accept as adequate to support a conclusion.  *Wall v.*

*Astrue*, 561 F.3d at 1052 (quotations and citations omitted).  Although the court will not reweigh

the evidence nor substitute its judgment for that of the Commissioner, the court will

"meticulously examine the record as a whole, including anything that may undercut or detract

from the ALJ's findings in order to determine if the substantiality test has been met."  *Id.* Even if

---

[1] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510.  Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities.  *See* 20 C.F.R. § 404.1520(c).  If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied.  At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings").  A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry.  If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work.  If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform.  *See Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007).  Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work.  20 C.F.R. § 404.1520.

the court would have reached a different conclusion, if supported by substantial evidence, the Commissioner's decision stands. *See White v. Barnhart*, 287 F.3d 903, 908 (10th Cir. 2002).

## Medical Evidence

<u>Treatment Records</u>

Records from Morton Comprehensive Health Services, show that from October 2007 through December 2010, Peterson was seen for general medical care by Njanja M. Ruenji, PA-C. (R.330-361). Peterson was diagnosed with asthma in December 2008 and was prescribed allergy medication and an inhaler. (R. 356). Peterson received follow-up care for asthma and menopausal symptoms. *Id.* Nowhere in the records for that time frame, did Peterson complain of neck, shoulder or back pain, headache or dizziness. (R.348–357). In March 2010, Peterson was seen for hormone check for menopausal symptoms including restlessness, sleeplessness, mood lability and hot flashes. (R. 353-354). Peterson was seen again in September and October 2010 for allergies, urinary tract infection and menopausal symptoms. (R. 349-353). Dr. Lanette Smith examined Peterson on December 8, 2010, and noted nipple discharge which Peterson reported had been going on "for some time" and in January 2011, the doctor ordered a Prolactin level test. (R. 342, 347). Peterson continued to deny headache or dizziness and her neck and extremities were reported to be normal. (R. 348). During follow-up examinations in March 2011, Peterson was advised to lose weight and to exercise regularly. (R. 346-347).

On April 15, 2011, Patrick P. Han, M.D., examined Peterson and noted her complaints of galacturia from both breasts since 2007 and her complaints of significant dizziness. (R. 402-403). Peterson gave a history of depression and pain in her legs while walking, memory problems, balance difficulties, headaches, dizziness and fainting spells. (R. 401). She also reported numbness, tingling and/or pain in her neck shoulders, arms, elbows, hands, hips, legs, knees,

feet, and low back. *Id.*  Upon examination, Peterson's strength in all extremities measured normal and she demonstrated normal range of motion in the cervical and lumbar spine with negative straight leg raise testing. (R. 398-403).  Dr. Han ordered MRI and lab studies. *Id.*

Peterson continued to receive general medical care at Morton Health Services through July 19, 2011. (R. 343-348).  On April 20, 2011, Peterson complained of poor balance and dizziness. (R. 345-346). An MRI showed pituitary microadenoma. *Id.* Lab specimen were taken and another appointment to see Dr. Patrick Han was made. *Id.*

Dr. Han reviewed the MRI and lab results and examined Peterson again on May 5, 2011. (R. 341, 397).  He advised Peterson and her primary care provider that the MRI showed the presence of a pituitary microadenoma[2] and that the lab work showed a twenty-times normal prolactin level. *Id.* After discussing the case with an endocrinologist, Dr. Han recommended medication to shrink the tumor and suggested that surgery would not be necessary. *Id.*  He said: "At this time the patient has no compression of the optic nerve and does not complain of any neurological problems. Her primary symptom is galactorrhea."[3]  On July 27, 2011, Dr. Han noted that Peterson's condition was stable and that she was doing well neurologically. (R. 393-395). Peterson complained of blurry vision but there was no acute change and her other symptom of galactorrhea had improved with recent prolactic levels down. *Id.*

Treatment records from Morton Health Services dated July 19, 2011, show Peterson continuing to complain of vaginal bleeding and an appointment for OB/GYN at OSU was made.

---

[2] A pituitary microadenoma is less than 10 mm in diameter and not visible by usual radiographic techniques; most endocrine-active adenomas are this size and are detected because of their hormone activities. Dorland's Ill. Med. Dictionary, 31st Ed. (1990) 1174.

[3]Gallactorrhea is excessive or spontaneous flow of milk irrespective of nursing. Dorland's, *id.* at 765.

(R. 343-344).  Peterson was treated for postmenopausal bleeding at OSU clinic in September and October 2011 and a biopsy was performed on October 27, 2011. (R. 460-461).  On November 14, 2011, the physician reported the postmenopausal bleeding had resolved. (R. 458).

Peterson underwent a follow-up brain MRI on August 3, 2011, which revealed that the previously identified mass had reduced in size and that deviation of the infundibular stalk was no longer present. (R. 409, 490).  On August 12, 2011, Dr. Han reported to Peterson's primary care provider that the medication regimen "significantly improved [Peterson's] symptoms," that she no longer had galactorrhea and that the MRI had demonstrated significant shrinkage of the tumor. (R. 534).  He recommended that Peterson continue the medication and see the endocrinologist in November. *Id.* He planned to order an MRI in one year. *Id.*  When Peterson came in for medication reconciliation consultation later that day, she claimed she was still dizzy some and that she had off balance issues and headaches. (R. 533).

On February 1, 2013, Dr. Han's progress notes indicate that Peterson consulted Dr. Han and said she "wants a 2nd opinion about her tumor removal." (R. 530-532).  She claimed she continued to have dizziness and headaches as well as some vision changes. *Id.* Upon examination, Peterson was assessed as being neurologically intact and stable. *Id.*  She was moving all extremities with equal strength rated 5/5 and she demonstrated normal gait, erect posture and normal balance. *Id.*  The doctor noted that the recent MRI demonstrated improvement of lesion that appeared "at least near to totally resolved." (R. 531).  He wrote:

> MRI of brain demonstrates no evidence of mass or abnormal enhancement. She has continued on bromocriptine with good results. Unfortunately patient has been experiencing side effects of the medication. Patient has the option to stop the bromocriptine and start another medication Dostinex. She also has the option of discontinuing medication and watching with imaging to determine if recurrence/growth. If this is the case, surgical resection would be

7

> indicated. We have discussed changing the medication. At this
> time patient desires to continue with the bromocriptine. Will order
> MRI brain in one year, will call with results. I have discussed the
> options for managing the patient's condition.

(R. 532).

The record contains a report from Family & Children's Services ("F&CS) dated July 13, 2010 through September 13, 2010. (R. 313-329).  Peterson met with clinicians on July 13, 2010, complaining of low motivation, little or no energy, mood swings, struggles with sleep and difficulty performing daily tasks. *Id.* A treatment plan was formulated with the goal of learning and implementing coping skills for managing depressive symptoms. *Id.*  Peterson saw Dr. Elka Serrano on July 27, 2010, was diagnosed with Major Depressive Disorder and Anxiety Disorder and she was prescribed Celexa, Risperdal and Trazodone.[4] *Id.*  Peterson kept her August 11, 2010, appointment, but the report shows that after several unsuccessful attempts at reaching her after that date, a clinician sent a termination and discharge letter on September 13, 2010. *Id.*

Consultative Examinations

Johna Kay Smasal, Ph.D., PLLC, conducted a consultative examination of Peterson on September 7, 2011. (R. 417-421).  Dr. Smasal repeated the history Peterson gave regarding her social life, activities of daily living, past work, medical treatment and complaints of depression and coping mechanisms. (R. 418-419).  Dr. Smasal noted that Peterson became very distressed while discussing a past abortion but that she did not meet the criteria for PTSD. (R. 419).  Dr. Smasal then conducted a cognitive examination and recorded her behavioral observations. (R. 419-420).  Dr. Smasal offered the following summary of her findings:

---

[4]It is not clear whether Peterson ever received the medication, as the clinician noted on August 11, 2010, that the paperwork had been completed and that the medications were expected to arrive in four to eight weeks at the physician's office. (R. 325).

Ms. Peterson initially appeared to be cautious in her rapport, and later she became more talkative, emotional, and open. Ms. Peterson is an attractive and intelligent woman. She spoke of a large, supportive family with whom she enjoys spending time. Ms. Peterson described a 20 year marriage to the father of her children in which she was abused and manipulated. She also became tearful as she discussed her abortion. Ms. Peterson said that she has had a great difficulty learning to trust others since. She is troubled by her diagnosis of a brain tumor, and has since struggled with low energy, irritability, depressed mood, avolition, and some social isolation. Her poor attention and concentration was evident during the cognitive examination. She often had difficulty following her own train of thought. In a work environment, her low energy, poor attention span, and self-reported memory problems are likely to interfere with her tasks.

(R. 421).  Dr. Smasal opined that Peterson would be capable of handling her finances responsibly. *Id.*  Her diagnostic impression was "Maj Depress Dis Recurr Epi Mod Both ... Ms. Peterson has a brain tumor. Chronic physical pain injuries." *Id.*

On September 9, 2011, Peterson was examined on behalf of the agency by Wayland Ron Billings, D.O. (R. 424-429).  Peterson reported a five year history of menstrual problems and the diagnosis of "prolactinoma." She claimed that treatment had eliminated the breast discharge but that she had continuing headaches and visual changes. *Id.*  She reported she "always feels weak and fatigue and that she got some improvement after blood transfusion but continues to lose blood almost on a daily basis." *Id.*  She said that these problems affect her activities of daily living. *Id.*  She reported being able to do light house chores including cooking and cleaning and said that she does drive. *Id.* Her complaints related to depression consisted of difficulty with sleep, lack of interest in normal activities, repeated feelings of guilt, decrease in energy, difficulty with concentration and changes in appetite. *Id.*  She included a past medical history of chronic low back pain, asthma and allergies. *Id.* Her only reported current medication was bromocriptine. *Id.*  Physical examination revealed normal findings and no neck pain was appreciated. *Id.* Range

9

of motion tests were all within normal limits. *Id.* Peterson moved about the exam room easily, she had full range of motion of her spine and she ambulated with a stable gait at an appropriate speed without use of assistive devises. *Id.*

A Psychiatric Review Technique form was filled out and signed by Ron Cummings, Ph.D., on September 13, 2011. (R. 434-447).  He evaluated functional limitations for Affective Disorders and Anxiety-Related Disorders - Major Depressive Disorder - Recurring Episode Moderate. (R. 437, 439).  He rated Peterson's restriction of activities of daily living as mild, her difficulties in maintaining social functioning and maintaining concentration, persistence or pace as moderate and he found no evidence of episodes of decompensation. (R. 444).  Dr. Cummings explained his findings by citing to the Family & Children's Services record, Dr. Han's most recent assessment, Dr. Smasal's report and Peterson's activities of daily living. (R. 446).  His analysis of the evidence was:

> The available, relevant MER in record adequately establishes the presence of psychiatric MDI(s) noted in Sections I and II of the PRTF. The claimant alleges that her mental symptoms are debilitating but the objective evidence does not fully support her claim. The claimant retains sufficient cognitive skills to perform day to day activities and demonstrates a reasonable level of competence with social interaction skills. The combination of clinical data and descriptive information suggests that functional limitations are moderately impaired as noted in Section III of the PRTF. The clmt has alleged additional functional limitations attributable to physical impairments that will be addressed in separate analysis. Refer to MRFC for further assessment of work related limitations.

(R. 446).

Dr. Cummings also filled out a Mental RFC Assessment form on September 13, 2011. (R. 430-433).  Dr. Cummings assessed Peterson with marked limitations in ability to understand, remember and carry out detailed instructions. (R. 430).  He assessed moderate limitations in

Peterson's ability to interact appropriately with the general public. (R. 431).  In all other

functions, Dr. Cummings found Peterson was not significantly limited. (R. 430-431).  As

explanation for his findings, Dr. Cummings wrote:

> The claimant is able to maintain concentration, persistence and
> pace for a normal work day and work week. The claimant is able to
> understand and carry out simple and some minimally complex
> work tasks. The claimant is able to recognize and avoid common
> work hazards. The claimant is able to adapt to changes in the work
> setting and make decisions regarding work tasks. The claimant is
> able to work with coworkers and supervisors on a superficial basis
> without being overly distracted by psychological symptoms. The
> claimant is moderately impaired in her ability to work effectively
> with the general public due to mood instability. The claimant's
> mood issues may cause difficulties with tasks involving sustained
> focus and complex mental demands. However, given limited
> public contact and allowances for occasional psychological
> problems affecting efficiency, the claimant remains mentally
> capable of understanding and carrying out simple instructions and
> assignments in a structured setting, in an appropriate time frame.

(R. 432).

On September 23, 2011, Karl K. Boatman, M.D., filled out and signed a Physical RFC

Assessment. (R. 449-456).  He determined Peterson had abilities to occasionally lift and/or carry

twenty pounds and frequently lift and/or carry ten pounds. (R. 450).  He found Peterson could

stand and/or walk and sit about six hours in an 8-hour workday and that her abilities to push

and/or pull were unlimited. *Id.*  In support of his findings, Dr. Boatman wrote:

> 51 yo DI, DIB female with 12 years of education, AOD
> 12/30/2008, DLI 6/30/2010, DOF 6/20/2011 alleges a back injury,
> left shoulder pain, left arm pain and pituitary gland growth
> problems. 3/11/2011 Morton Comp Health Serv records MR Brain
> impression lesion in right side of sella compatible with a pituitary
> microadenoma. 4/20/2011 assessment obesity and benign pituitary
> neoplasm, 5/5/2011 labs show normal results for growth hormone,
> TSH, LH, thyroid and cortisol. The goal is tumor should shrink
> using medication and that surgery would not be necessary. Her
> primary symptom is galactorrhea. 12/8/2010 pt has asthma but

> does not take any medicines other than inhalers. 1/6/2011 Patrick
> Han records dx for puerperal galactorrhea, 4/20/2011 benign
> neoplasm of pituitary gland and craniopharyngeal duct. 7/27/2011
> bp 113/74, ht 5'7", wt 209, respiratory normal, cardiobascular
> normal, CN II-X11 grossly intact, full ROM of spine, fine tactile
> manipulation of objects is normal, SLR negative bilaterally,
> toe/heel walking normal and ambulates with a stable gait at an
> appropriate speed, dx prolactinoma controlled with medication,
> premenopausal abnormal vaginal bleeding and depression.
> ADLs record pain of back, neck and feet affect ability to bend,
> stand, sleep, perform personal care, house and yard work.

(R. 450-451).  Dr. Boatman found that no postural, manipulative, visual, communicative or

environmental limitations had been established. (R. 451-456).

On April 3, 2012, William R. Grubb, M.D., examined Peterson. (R. 467-473).  He

recorded Peterson's subjective complaints of left shoulder, arm, neck and lower back pain. *Id.*

He conducted a physical examination and reported Peterson's back and extremities were without

evident joint deformity, redness, swelling, heat, tenderness, erythema or edema with no evidence

of asymmetric atrophy or weakness. (R. 469).  Peterson's gait was normal in terms of speed,

stability and safety and her grip strength was 5/5 bilaterally. *Id.*  Dr. Grubb's impression was:

> 1. Probable degenerative disease of the lumbosacral and cervical
> spine.
> 2. Low back and neck pain probably secondary to number 1 above.
> 3. Asthma and history of recent possible pneumonia.
> 4. Irregular periods with polymenorrhea, presently on
> bromocriptine, Ketoprofen and medroxyprogesterone.

*Id.*  The charts attached to Dr. Grubb's report show decreased range of motion in the back, neck,

hips, both knees, shoulders, and in finger hyper-extension in left and right digits. (R. 470-472).

Range of motion in the lumbosacral spine was decreased without scoliosis but positive for pain.

(R. 473).  Peterson's cervical spine also showed slightly decreased range of motion without pain.

*Id.*

On April 16, 2012, Peterson was again evaluated by Dr. Smasal. (R. 476-480).  Dr. Smasal updated the social and medical history Peterson gave since her prior appointment on Sept. 7, 2011. (R.479).  She summarized the evaluation as follows:

> Ms. Peterson was a pleasant and talkative claimant who arrived on-time appropriately dressed and groomed. Ms. Peterson is an attractive and intelligent woman. Ms. Peterson described a 20 year marriage to the father of her children in which she was abused and manipulated. She also became tearful as she discussed her current life circumstances including lack of income or health insurance. Ms. Peterson said that she has had a great difficulty learning to trust others since. She is troubled by her diagnosis of a brain tumor, and has since struggled with low energy, irritability, depressed mood, avolition, and some social isolation. Her poor attention and concentration was evident during the cognitive examination. She often had difficulty following her own train of thought. In a work environment, her low energy, poor attention span, and self-reported memory problems are likely to interfere with her tasks. Her prognosis is guarded.

(R. 479-480).  Dr. Smasal's diagnostic impression was: "Maj Depress Dis Recurr Epi Mod Both; Uns Persist Ment Dis In Ot Cond Both; Ms. Peterson has a brain tumor. Chronic physical pain injuries. Occupational; Economic; Healthcare Access." (R. 480).

At the supplemental hearing on September 9, 2013, Don Roger Clark, M.D., appeared by telephone. (R. 37-41).  Dr. Clark testified that he had reviewed all the medical evidence in the record. (R. 38).  Dr. Clark recited Peterson's history of galactorrhea and her treatment for and the resolution of a benign pituitary tumor. *Id.*  He noted that Peterson is overweight, with a body mass index of over 32. *Id.*  He testified that Peterson has complained of asthma but that the record contained no pulmonary function studies and there were no reports of wheezing in her lungs so he had "no objective way to pin that down." *Id.*  He also noted Peterson's complaints of sleep difficulty, a 10-year history of crying spells and "then of late she complained of neck and shoulder pain." *Id.*  Dr. Clark specifically noted Dr. Boatman's September 23, 2011, physical

RFC assessment and Dr. Grubb's April 13, 2012 physical examination. (R. 38-39).  Dr. Clark

testified that Dr. Grubb found some limitation in range of motion of Peterson's neck, but that she

had no pain and her reflexes were normal, so he did not feel that was necessarily limiting. (R.

39).  Dr. Clark opined that Peterson's sleep problems might be related to obstructive sleep apnea,

based upon her body mass index, but noted that she had not been tested for that. (R. 39, 41).  Dr.

Clark agreed with Dr. Boatman's physical RFC assessment. (R. 39-40).  He noted that with a

history of asthma, a restriction in the workplace for smoke might be indicated but there are no

pulmonary function studies and "in all the physical examinations nobody has recorded any

wheezes in her lungs, so I'm not sure how that diagnosis was established." *Id.*  Under questioning

by Peterson's attorney regarding Peterson's complaints of dizziness and being unbalanced on her

feet, Dr. Clark said he was not familiar with the pituitary medication Peterson is taking but those

symptoms are "not a pituitary thing." (R. 40).  Dr. Clark noted that Dr. Grubb found no

instability during his examination of Peterson. *Id.*

### Decision of the Administrative Law Judge

In his decision, the ALJ found at Step One, that Peterson had not engaged in any

substantial gainful activity since her alleged onset date of December 30, 2008. (R. 14).  At Step

Two, the ALJ found that Peterson has severe impairments of history of benign pituitary

neoplasm, history of puerperal galactorrhea, history of left shoulder and arm pain, history of

asthma, sleep difficulties, depression and anxiety. *Id.*  At Step Three, the ALJ found that

Peterson's impairments did not meet any Listing.  (R. 15).  Regarding Peterson's mental

impairments, the ALJ found that Peterson has mild restriction in activities of daily living and

moderate difficulties in social functioning, concentration, persistence or pace. *Id.* He concluded

that Peterson had experienced no episodes of decompensation. *Id.*

The ALJ found that Peterson has the RFC to lift and/or carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk 6 hours in an 8-hour workday, sit at least 6 hours in an 8-hour workday, and that she is able to perform simple, repetitive tasks, relate to supervisors and coworkers only superficially, and not work with the general public. (R. 16).[5]

The ALJ summarized Peterson's testimony. (R. 17). He summarized the medical evidence in the record, noting that Peterson first went to the doctor because of dizziness and fatigue in 2010. (R.17). The ALJ pointed to Dr. Clark's testimony and the exhibits endorsed by Dr. Clark. *Id.* The ALJ summarized the medical evidence in the record in detail, taking particular notice of Dr. Smasal's findings, Dr. Grubb's findings, and the opinions of the agency consultants. (R. 17-23).  Regarding Peterson's complaints of mental impairments, the ALJ noted that Peterson had not followed through with the treatment plan from Family and Children's Services. (R. 23). With regard to Peterson's claim of medication side effects, the ALJ found that the office treatment notes do not corroborate those allegations, other than some blurriness of vision.  *Id.* The ALJ also concluded that the medical record failed to demonstrate the presence of medical findings or neurological abnormalities that would establish the existence of a pattern of pain of such severity as to prevent Peterson from engaging in any work on a sustained basis. *Id.*

The ALJ found the inconsistencies between the medical treatment record and examination reports and Peterson's testimony reduced Peterson's credibility. (R. 24).  He noted that the record does not contain any treating physician's opinion that Peterson is disabled or has limitations greater than those he assessed in the RFC. (R. 25).

---

[5] The mental functional limitations comport with the findings of Dr. Cummings. (R. 432).

Regarding Peterson's physical limitations, the ALJ gave "great weight" to the opinions of Dr. Billings, who examined Peterson, the agency consultants' RFC assessments and Dr. Clark who testified at the supplemental hearing. (R. 25).

The ALJ then said:

> With regard to the opinions of the medical experts and consultants regarding the claimant's mental status, the claimant was given mental limitations, as outlined in Exhibit 7F; however, it does not seem likely she has a severe mental condition as she has not sought additional mental health treatment or prescribed medication for her depressive disorder. Therefore, the opinions at Exhibits 7F, 8F and 14F are given little weight.

(R. 25).[6]

At Step Four, the ALJ determined that Peterson could not return to her past relevant work as a nursery school attendant, correction officer and food inspector. (R. 25). At Step Five, the ALJ found that there are a significant number of jobs in the national economy that Peterson could perform, taking into account her age, education, work experience and RFC. (R. 26-27). The ALJ thus found that Peterson was not disabled at any time from December 30, 2008, through October 23, 2013, the date of his decision. (R. 27).

## Review

Peterson asserts that the ALJ's analysis and findings regarding Peterson's mental impairments are internally inconsistent and inconsistent with the agency's rules and regulations. [Dkt. 18, at 7]. Peterson also contends that the ALJ did not explain what weight, if any, he gave Dr. Smasal's opinions or explain the rationale behind his consideration of Dr. Smasal's reports. [Dkts. 18, at 10; 26, at 3]. The Commissioner defends the ALJ's decision, asserting first that the

---

[6]Exhibit 7F and 8F are the PRT and Mental RFC by Ron Cummings, Ph.D., dated September 13, 2011. (R. 430-447). Exhibit 14F is a Case Analysis by Don B. Johnson, Ph.D., who concurred with Dr. Cummings' findings on May 25, 2012. (R. 481).

ALJ properly gave little weight to the opinions of the medical experts and consultants regarding Peterson's mental status, then arguing later in her brief that the ALJ's RFC determination was consistent with portions of the consultants' opinions. [Dkt. 25].  The Commissioner also argues that the ALJ meant to include Dr. Smasal's opinion when he gave little weight to the opinions of the medical experts and *consultants* regarding Peterson's mental status. [Dkt. 25, at 9] (emphasis added).

Regarding opinion evidence, generally the opinion of a treating physician is given more weight than that of an examining consultant, and the opinion of a nonexamining consultant is given the least weight.  *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004).  The ALJ is required to discuss all opinion evidence and to explain the weight he gives it. *Id.*  In this case, because there is no treating physician opinion regarding Peterson's mental abilities to perform work activities, the only medical evidence available to the ALJ in that regard was the opinions of agency physicians.

Dr. Smasal twice conducted an in-person examination of Peterson at the request of the ALJ. (R. 417-421, 476-480).  Dr. Smasal's opinions are therefore considered "examining medical-source opinion(s)." *Chapo v. Astrue*, 682 F.3d. 1285, 1291 (10th Cir. 2012) see also 20 C.F.R. §§ 404.1527(c)(1); 416.927(c)(1).  Such opinions are "given particular consideration" in that they are "presumptively entitled to more weight than a doctor's opinion derived from a review of the medical record." *Chapo*, 682 F.3d at 1291. An examining medical-source opinion "may be dismissed or discounted, of course, but such an act must be based on an evaluation of all of the factors set out in the ... regulations and the ALJ must provide specific, legitmate reasons for

rejecting it." *Id.* (internal quotation marks omitted).[7]   Analysis under these factors applies to examining medical-source opinions. *See Chapo*, 682 F.3d at 1291; see also 20 C.F.R. §§ 404.1527(c); 416.927(c). The ALJ is not required to mechanically apply all of these factors in a given case. *See Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007).  It is sufficient if he "provide[s] good reasons in his decision for the weight he gave to the [physician's] opinions. *Id.* But the duty to supply such reasons is the ALJ's, neither the Commissioner nor the courts may supply post-hoc reasons that the ALJ did not provide. *See Kauser v. Astrue,* 638 F.3d 1324, 1330 (10th Cir. 2011)*.*

Because a psychological opinion may rest either on observed signs and symptoms or on psychological tests, Dr. Smasal's observations about Peterson's limitations constitute specific medical findings. See *Washington v. Shalala*, 37 F.3d 1437, 1441 (10th Cir. 1994).   The ALJ summarized both of Dr. Smasal's reports but he did not discuss her findings regarding Peterson's functional limitations, nor did he state the weight he accorded her opinions.  Because the ALJ failed to provide any explanation of how he assessed the weight of Dr. Smasal's findings, the court cannot simply presume the ALJ applied the correct legal standards in considering Dr. Smasal's opinions. *Watkins v. Barnhart*, 350 F.3d 1297, 1301 (10th Cir. 2003).

The Commissioner's argument that the ALJ  implicitly rejected Dr. Smasal's opinion regarding Peterson's mental limitations based upon Peterson's failure to seek further treatment for her mental impairments does not justify the ALJ's failure to discuss that opinion evidence and

---

[7] The relevant factors include: 1) the length of the treatment relationship and the frequency of examination; 2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; 3) the degree to which the physician's opinion is supported by relevant evidence; 4) consistency between the opinion and the record as a whole; 5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and 6) other factors brought to the ALJ's attention which tend to support or contradict the opinion. *Watkins v. Barnhart*, 350 F. 3d 1297, 1301 (10th Cir. 2003).

weigh it in accordance with the required factors.  In rejecting a treating physician's opinion, the

ALJ must first consider whether the opinion is well supported by medically acceptable clinical

and laboratory diagnostic techniques.  *Robinson v. Barnhart*, 366 F.3d 1078, 1082 (10th Cir.

2004). Even if the reporting physician is not considered a "treating source" the ALJ can only

reject a medical opinion by weighing it under the required factors and providing "specific

legitimate reasons." *Doyal v. Barnhart*, 331 F.3d 758, 764 (10th Cir. 2003).  Contrary to the

Commissioner's argument, the ALJ did not include Dr. Smasal's reports in the exhibits he

identified as entitled to "little weight." (R. 25). [Dkt. 25, at 9].  He specifically listed the PRT and

MRFC by Dr. Cummings and the Case Analysis by Don B. Johnson, Ph.D., by exhibit number but

he did not mention Dr. Smasal's opinions in the portion of this decision where he discussed the

weight he assigned the medical evidence. (R. 25).[8]  At any rate, the explanation the ALJ offered

for assigning little weight to the opinions of the agency consultants who based their findings on

review of the record, including the reports by Dr. Smasal, was improper.

The ALJ gave "little weight" to the opinions of the agency consultants but he did not

engage in the analysis set forth by the Commissioner in her response brief. [Dkt. 25].  He did not

explain why his RFC incorporated some of the consultants' opinions on Peterson's mental

functioning while finding portions of their opinions were inconsistent with other medical evidence

in the record, as described in the Commissioner's brief. [Dkt. 25, at 7-8].   While there is ample

evidence in the record to support the Commissioner's arguments, judicial review is limited to the

reasons stated in the ALJ's decision.  Therefore, the Commissioner's post hoc rationale is

improper because it usurps the agency's function of weighing and balancing the evidence in the

first instance. *See Allen v. Barnhart*, 357 F.3d 1140, 1142, 1145 (10th Cir. 2004).

---

[8] Dr. Smasal's reports are identified in the record as Exhibits 5F and 13F.

The court agrees with Peterson that the ALJ's decision is internally inconsistent as he apparently included in his RFC some of the functional limitations assessed by Dr. Cummings but then stated that it did not seem likely that Peterson has a severe mental condition because she has not sought additional mental health treatment or medication, and so gave that medical opinion little weight. (R. 25).  Failure to pursue medical treatment is not a proper basis to reject a medical opinion. *See Robinson v. Barnhart,* 366 F.3d 1078, 1083 (10th Cir. 2004) (ALJ's rejection of doctor's opinion based upon speculative lay opinion that claimant failed to comply with prescribed treatment is an improper basis to reject the treating physician's opinion) (citing *McGoffin v. Barnhart*, 288 F.3d 1248, 1252 (10th Cir. 2002) (An ALJ may not make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion)).

It may be that, upon a full consideration of all the medical evidence and vocational factors applicable in this case, the Commissioner would determine that Peterson is not disabled.  Here, however, the ALJ cut short the analysis and, by de facto rejecting all the medical evidence regarding Peterson's mental impairments, he failed to support his RFC assessment with substantial evidence.  A decision not supported by substantial evidence must be reversed. Additionally, failure to apply the correct legal standard or to provide the court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal. *Williams v. Bowen*, 844 F.748, 750 (10th Cir. 1988) (citing *Byron v. Heckler*, 742 F.2d 1232, 12135 (10th Cir. 1984) (internal quotes omitted).

The undersigned finds that reversal is required due to errors of the ALJ in his discussion and analysis of the opinion evidence of Dr. Smasal and the non-examining agency consultants.

**Conclusion**

The Court takes no position on the merits of Peterson's disability claim, and "[no] particular result" is ordered on remand.  *Thompson v. Sullivan*, 987 F.2d 1482, 1492-93 (10th Cir. 1993).  This case is remanded only to assure that the correct legal standards are invoked in reaching a decision based on the facts of the case.  *Angel v. Barnhart*, 329 F.3d 1208, 1213-14 (10th Cir. 2003), *citing Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988).

Based on the foregoing, the October 23, 2013, decision of the Commissioner denying disability benefits to Claimant is **REVERSED AND REMANDED for reconsideration.**

Dated this 12th day of September, 2016.

Paul J. Cleary
United States Magistrate Judge

21